## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

|  |  |
|---|---|
| | Case No. 3:20-bk-31620-SHB |
| K&L TRAILER LEASING, INC. | Chapter 11 |
| Debtor | |

GREENEVILLE FEDERAL BANK, FSB

Plaintiff

v.                                                          Adv. Proc. No. 3:23-ap-03010-SHB

FIRST FARMERS AND COMMERCIAL BANK

Defendant


## MEMORANDUM ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**APPEARANCES**:    LAUGHLIN, NUNNALLY, HOOD & CRUM, PC
        Jerry W. Laughlin, Esq.
        100 South Main Street
        Greeneville, Tennessee  37743-4922
        Attorneys for Plaintiff

        EVANS HARRISON HACKETT PLLC
        Scott M. Shaw, Esq.
        835 Georgia Avenue
        Suite 800
        Chattanooga, Tennessee  37402
        Attorneys for Defendant


**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff Greeneville Federal Bank ("GFB") initiated this adversary proceeding by the filing of its complaint seeking determination by the Court that GFB's properly perfected inventory lien has priority over the properly perfected liens of Defendant First Farmers & Commercial Bank ("FF&CB") in ten trailers that were transferred by GFB's debtor, K & L Sales & Leasing, Inc. ("Sales") to K&L Trailer Leasing, Inc. ("Leasing").[1]  GFB and FF&CB filed cross-motions for summary judgment.

This dispute requires the Court to apply Tennessee's version of Article 9 of the Uniform Commercial Code ("UCC").  The Court applies the law here exactly as it applied it in *Greeneville Federal Bank, FSB v. Fellhoelter* (*In re K&L Trailer Leasing, Inc.*), 630 B.R. 81 (Bankr. E.D. Tenn. 2021) (hereinafter "*GFB I*").  Given the undisputed material facts, the Court concludes that secured transactions principles preserved GFB's properly perfected inventory lien when Sales transferred GFB's collateral to Leasing in transactions that were not in the ordinary course of business such that GFB's security interest in the ten trailers has priority over FF&CB's security interest in the same trailers.

## I.  UNDISPUTED MATERIAL FACTS

The parties have stipulated and/or the record reflects the following facts.  On October 1, 2010, a Revolving Loan Agreement was executed between GFB and Sales, with acknowledgment and consent also given by Leasing; Fellhoelter Enterprises, LLC; Kris and Amy Fellhoelter; and Marvin and Linda Fellhoelter[2] through which GFB issued a floor-plan line

---

[1] GFB seeks to recover from FF&CB the proceeds it received from the Chapter 11 Trustee's sale of the ten trailers.

[2] At all times relevant to this adversary proceeding, Leasing was a Tennessee corporation in the business of leasing (but not selling) big rig trailers. [Doc. 23 at ¶ 1; Doc. 32 at ¶ 1.]  Both Leasing and Sales maintained a place of business at 7828 Rutledge Boulevard in Knoxville, Tennessee, and Kris Fellhoelter, who owned 100% of the outstanding stock in Sales and 50% of the outstanding stock in Leasing, was President and acting general manager of both companies. [Doc. 21 at ¶¶ 19, 22, 24; Doc. 26 at ¶¶ 19, 22, 24.]  Leasing, through Kris Fellhoelter; Fellhoelter Enterprises, Inc.; and each of the Fellhoelters who executed the Revolving Loan Agreement did so "for the purpose of acknowledging and consenting to the terms and provisions [thereof]." [Doc. 19-2 at ¶ 7.15; Doc. 21 at ¶ 3; Doc. 26 at ¶ 3.]

of credit to Sales for its big rig trailers ("Line of Credit").[3] [Doc. 19-2; Doc. 21 at ¶¶ 1-2; Doc.

26 at ¶¶ 1-2.]  GFB and Sales also entered into a Promissory Note for $2,500,000.00 on October

1, 2010, that included the interest rate for the Line of Credit.[4] [Doc. 19-6; Doc. 21 at ¶¶ 2, 6;

Doc. 26 at ¶¶ 2, 6.]  Additionally, under the Security Agreement between GFB and Sales, also

dated October 1, 2010 (which incorporated by reference the Revolving Loan Agreement), GFB

was granted a security interest in virtually all assets of Sales, including but not limited to all

current and after-acquired inventory. [Doc. 19-4; Doc. 21 at ¶¶ 1, 4, 11; Doc. 26 at ¶¶ 1, 4, 11.]

On October 4, 2010, GFB filed with the Tennessee Secretary of State a UCC-1 Financing

Statement reflecting the security interest that has been continuously retained[5] in "[a]ny and all

personal property of [Sales], tangible and intangible, including without limitation, equipment,

inventory, accounts receivable, contract rights, general intangibles and all other personal

---

[3] As is relevant to this adversary proceeding, Exhibit A to the Revolving Loan Agreement entitled "Definitions and Accounting Terms" includes the following definitions:

"Ordinary Course of Business" as applied to sales of Inventory of the Borrower shall mean (a) a bona fide retail sale to a purchaser, for his own use at the fair market value or fair cash price, as the case may be (such purchaser or lessee not being a Related Person),, and (b) an occasional sale of such Inventory to another dealer who is not a Related Person at a price not less than Borrower's cost of the Inventory sold, provided such sale is not a part of a plan or course of action to liquidate all or a portion of the Borrower's business.

"Person" means an individual, partnership, corporation, trust, unincorporated organization, association, joint venture or a government or agency or political subdivision thereof.

"Related Person" shall mean any person (a) which now or hereafter directly or indirectly through one or mor intermediaries controls, or is controlled by, or is under common control with, the Borrower, or (b) which now or hereafter beneficially owns or holds five percent (5%) or more of the, [sic] capital stock of the Borrower, or (c) five present (5%) or more of the capital stock of which is beneficially owned or held by the Borrower. For purposes hereof, "control" shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting stock, by contract or otherwise.

[Doc. 19-2 at 22-23; Doc. 21 at ¶¶ 14-16; Doc. 26 at ¶¶ 14-16.]  The parties do not dispute that at all times since October 1, 2010, Leasing and Sales are "related persons" as defined by the Revolving Loan Agreement. [Doc. 21 at ¶ 17; Doc. 26 at ¶ 17.]

[4] The Promissory Note was to change the date and interest rate. [Doc. 19-6; Doc. 21 at ¶ 6; Doc. 26 at ¶ 6.]

[5] Continuation statements of the UCC-1 were recorded on October 1, 2015, and September 2, 2020. [Doc. 19-4; Doc. 21 at ¶ 5; Doc. 26 at ¶ 5.]

property of [Sales]." [Doc. 19-4; Doc. 21 at ¶¶ 1, 5; Doc. 26 at ¶¶ 1, 5.]

Concerning the collateral, the Security Agreement states, in material part:

<u>Covenants as to the Collateral</u>.  So long as any of the Obligations shall remain outstanding, unless Bank shall otherwise consent in writing:

. . . .

(f) <u>Transfers and Other Liens</u>.  Without the prior written consent of Bank, the Grantor will not (i) sell, assign (by operation of law or otherwise), exchange, or otherwise dispose of any of the Collateral (except for sale or other use of inventory in the ordinary course of business); or (ii) create or suffer to exist any lien, security interest or other charge or encumbrance upon or with respect to any of the Collateral except for the security interest created by this Agreement and except for any security interest specifically disclosed in Exhibit "A," attached hereto.

[Doc. 19-3 at ¶ 5(f); Doc. 21 at ¶ 12; Doc. 26 at ¶ 12.]  GFB and Sales contemplated the revolving nature of the trailer inventory when they entered into the Revolving Loan Agreement, and GFB was aware that Sales purchased new trailers with funds that were not borrowed from GFB. [Doc. 26 at 11 ¶¶ 2-3; Doc. 29 at ¶¶ 2-3.]

With respect to amendments or modifications, the Revolving Loan Agreement expressly states that "[t]he provisions of this Loan Agreement, the Note, or any other instrument or document now or hereafter securing the Obligations may be amended or modified only by an instrument in writing signed by the parties hereto." [Doc. 19-2 at ¶ 7.1; Doc. 21 at ¶ 13; Doc. 26 at ¶ 13].  Correspondingly, the Security Agreement provides the following with respect to amendments:

(a) No amendment of any provision of this Security Agreement shall be effective unless it is in writing signed by the Grantor and the Bank, and no waiver of any provision of this Agreement, and no consent to any departure by the Grantor therefrom, shall be effective unless it is in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b) No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder or any other instrument or document shall operate as a waiver

thereof; nor shall any single or partial exercise of any such right preclude any other
or further exercise thereof or the exercise of any other right . . . .

[Doc. 19-3 at ¶¶ 13(a), (b); Doc. 21 at ¶¶ 9-10; Doc. 26 at ¶¶ 9-10.]  The Security Agreement

also specified that all terms used therein "are defined in the Loan Agreement or in Article 9 of

the [UCC] . . . of Tennessee, as now or hereafter in effect, and which are not otherwise defined

herein shall have the same meanings herein as set forth therein." [Doc. 19-3 at ¶ 1(a); Doc. 21 at

¶ 11; Doc. 26 at ¶ 11.]

Sales made its payments to GFB on the Line of Credit in the form of checks drawn on a

Sales checking account. [Doc. 21 at ¶ 8; Doc. 26 at ¶ 8.]  Unless the payment was for repayment

of an advance on the Line of Credit for which Sales was unable to timely deliver a title, each

check included a list of vehicle identification numbers ("VINs") and a dollar amount next to the

VIN of the trailer for which Sales was paying in exchange for authorization to transfer that

particular trailer free and clear of GFB's security interest. [Doc. 21 at ¶ 8; Doc. 26 at ¶ 8.]  GFB,

however, was not provided with the identity of any particular trailers purchased through the Line

of Credit. [Doc. 21 at ¶ 7; Doc. 26 at ¶ 7.]

In March 2019, Sales transferred the following ten trailers ("Subject Trailers") to Leasing

that were included within GFB's blanket security interest in inventory, which GFB did not take

any affirmative action to release:

VIN IUYVS2536L7769811
VIN IUYVS2538L7769812
VIN IUYVS253XL7769813
VIN IUYVS2531L7769814
VIN IUYVS2533L7769815
VIN IUYVS2535L7769816
VIN IUYVS2537L7769817
VIN IUYVS2539L7769818

VIN IUYVS2530L7769819

VIN IUYVS253L7769820[6]

[Doc. 19-2 Exs. 8, 9; Doc. 21 at ¶¶ 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 49; Doc. 23 at ¶¶ 2, 10; Doc. 26 at ¶¶ 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 49; Doc. 32 at ¶¶ 2, 10.]  The first five of the Subject Trailers were transferred on March 6, 2019, and the second five were transferred on March 21, 2019, as reflected in invoices from Sales to Leasing for each respective sale. [Doc. 23 at ¶¶ 3, 11; Doc. 23-1 Exs. 1, 5; Doc. 32 at ¶¶ 3, 11.]

By a Commercial Promissory Note dated March 7, 2019, Leasing borrowed $125,300.00 from FF&CB to purchase the first half of the Subject Trailers and, by a Commercial Security Agreement also dated March 7, 2019, granted FF&CB a security interest in those specific trailers. [Doc. 23 at ¶¶ 4-6, 9; Doc. 23-1 Exs. 2, 4; Doc. 26 at 11 ¶ 1; Doc. 29 at ¶ 1; Doc. 32 at ¶¶ 4-6, 9.]  Similarly, Leasing borrowed $125,300.00 from FF&CB to purchase the second half of the Subject Trailers under a Commercial Promissory Note dated March 21, 2019. [Doc. 23 at ¶¶ 12-13; Doc. 23-1 Ex. 6; Doc. 26 at 11 ¶ 1; Doc. 29 at ¶ 1; Doc. 32 at ¶¶ 12-13.]  Leasing also executed a Commercial Security Agreement on March 21, 2019, granting FF&CB a security interest in the specified trailers. [Doc. 23 at ¶¶ 14, 17; Doc. 23-1 Ex. 8; Doc. 32 at ¶¶ 14, 17.]  The title documents for all ten Subject Trailers reflect a first lien in favor of FF&CB and do not reflect a security interest in favor of any other party. [Doc. 19-10; Doc. 23 at ¶¶ 7-8, 15-16; Doc. 23-2 Ex. 3; Doc. 26 at 11 ¶ 1; Doc. 29 at ¶ 1; Doc. 32 at ¶¶ 7-8, 15-16.]  FF&CB did not give notice to GFB of its security interest in the Subject Trailers, did not make any payments to GFB with respect to its blanket security interest in the Subject Trailers, and took no action to obtain a release from GFB as to the Subject Trailers. [Doc. 21 at ¶¶ 20, 46-48; Doc. 26 at ¶¶ 20, 46-48.]

---

[6] The VINs referenced in this memorandum were derived from the Certificates of Origin for the respective trailers. [Doc. 19-10; Doc. 23-1 Ex. 3].

At the time that FF&CB acquired its security interest from Leasing in the Subject Trailers,

examination of Leasing's documents of ownership for the Subject Trailers would have reflected

that each trailer was acquired from Sales. [Doc. 21 at ¶ 18; Doc. 26 at ¶ 18.]  Indeed, the invoices

provided by Leasing to FF&CB were on Sales's form and reflected Kris Fellhoelter as the

"salesman." [Doc. 23-1 at 4, 21.]  Leasing possessed only certificates of origin and not

Tennessee titles for the Subject Trailers when FF&CB submitted documents for notation of its

liens on the titles. [*See* Doc. 21 at ¶ 21; Doc. 26 at ¶ 21.]

## II.  SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law[,]" utilizing the procedures for Rule 56(c) (applicable in

adversary proceedings through Rule 7056 of the Federal Rules of Bankruptcy Procedure).  The

Court does not weigh the evidence to determine the truth of the matter asserted when deciding a

motion for summary judgment but simply determines whether a genuine issue for trial exists.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Id.*

Each movant bears the burden of proving that summary judgment is appropriate by

establishing that there is no genuine dispute concerning any material fact, such that any claim or

defense alleged is factually unsupported.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  Once the initial burden is met, the non-moving party must raise a genuine dispute of

material fact for trial and may not rely solely on allegations or denials contained in the pleadings.

*See Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006) (holding that reliance on a "mere

scintilla of evidence in support of the nonmoving party will not be sufficient"); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The facts and all resulting inferences are viewed in a light most favorable to the nonmoving party, and the Court must decide whether "the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243. "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a [fact-finder] to return a verdict for that party.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (quoting *Anderson*, 477 U.S. at 249). Nevertheless, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

## III. THE PARTIES' POSITIONS

GFB argues that its perfected inventory lien on Sales's inventory remained attached to the Subject Trailers after they were transferred to Leasing because Leasing was not a buyer in the ordinary course and GFB did not consent to the transfers to Leasing. Concerning whether the transfers were sales to a buyer in the ordinary course of business under Tennessee Code Annotated section 47-1-201(9), for purposes of summary judgment, GFB focuses on the fact that the transfers were made by Kris Fellhoelter in his capacity as an owner of both Sales and Leasing and that he knew that transfer of the Subject Trailers would violate GFB's security interest. GFB relies on the express terms of its Revolving Loan Agreement and Security Agreement with Sales and on Tennessee Code Annotated sections 47-1-201(9) and 47-9-507, as applied by this Court in *GFB I*.

FF&CB argues that the Court erred in its prior interpretation and application of Tennessee's codified UCC provisions. FF&CB primarily relies on Tennessee Code Annotated sections 47-9-311 and 55-3-126, which require liens to be noted on certificates of title for

collateral subject to Tennessee's certificate-of-title laws unless the collateral is inventory held for sale by a person in the business of selling goods of that kind. FF&CB asserts that because Leasing held the trailers and Leasing was not in the business of selling trailers, GFB lost perfection of its lien under section 47-9-311 and FF&CB's notation of its liens on the certificates of title for the Subject Trailers supplanted GFB's prior UCC lien on the Subject Trailers as inventory of Sales, with the result being that FF&CB's lien on each of the Subject Trailers has priority over GFB's unperfected interest. FF&CB also argues in opposition to GFB's motion for summary judgment that GFB implicitly authorized transfer of the Subject Trailers from Sales to Leasing by GFB's acquiescence in the transfer of trailers that were not purchased directly by GFB's funding to Sales.[7]

## IV.  ANALYSIS

The starting point for the Court's determination about the perfection and priority issues is the UCC as adopted in Tennessee. As the Court explained in *GFB I*:

> Under Tennessee law, GFB's only method of perfecting its lien on the inventory of Sales was by the filing of a financing statement. *See* Tenn. Code Ann. § 47-9-311(d) (providing that when collateral that is governed by a certificate-of-title statute is inventory held for sale or lease by a person who is in the business of selling goods of that kind, the requirements of the certificate-of-title statute do not apply). Indeed, comment 4 to section 47-9-311 explains that "[c]ompliance with the certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory to which this subsection applies." Tenn. Code Ann. § 47-9-311 cmt. 4. Thus, GFB's security interest in the trailer-inventory of Sales was continuously perfected from the date that GFB filed the UCC-1.

*GFB I*, 630 B.R. at 87.

---

[7] FF&CB asserts that the parties do not dispute that the Subject Trailers were purchased by Sales with funds of First Peoples Bank and not from funds loaned by GFB. [Doc. 25 at 60 (citing Aff. of Michael Burns [Doc. 26-2]).] None of the statements of undisputed material facts proposed by FF&CB, however, aver that the *Subject Trailers* were not purchased with GFB funds. Nevertheless, the Court finds that such an assertion is immaterial to the Court's decision because GFB's perfected inventory lien covered *all* trailer inventory of Sales regardless of the funding source for purchases.

The general rule concerning disposition of collateral contrary to a secured party's security interest is found at Tennessee Code Annotated section 47-9-315(a), which provides:

Except as otherwise provided in this chapter and in § 47-2-403(2):

(1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and

(2) a security interest attaches to any identifiable proceeds of collateral.

Section 47-9-507(a) coordinates with section 47-9-315(a) to make clear that the secured party's perfection is uninterrupted by disposition of the collateral when section 47-9-315(a) applies to continue the security interest: "A filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a security interest or agricultural lien continues, even if the secured party knows of or consents to the disposition." Tenn. Code Ann. § 47-9-507(a). As explained by comment 3, the secured party retains its perfected lien after transfer even if the collateral is "owned by a person other than the debtor against whom the financing statement was filed." Tenn. Code Ann. § 47-9-507 cmt. 3.

To be sure, secured transactions principles provide exceptions to the general rule that a perfected security interest remains attached to and perfected in collateral that is transferred by the secured party's debtor.

First, if chapter 9 of title 47 provides some exception to the general rule, then a perfected security interest will not continue in collateral disposed of by a debtor. Tenn. Code Ann. § 47-9-315(a). Second, if a secured party entrusts goods subject to the creditor's security interest to a merchant who deals in goods of that kind, the merchant has the power to transfer all rights of the creditor "to a buyer in the ordinary course of business." Tenn. Code Ann. § 47-2-403(2), *cited in* Tenn. Code Ann. § 47-9-315(a). Third, if a secured party authorizes the disposition of its collateral free of the security interest, then that disposition terminates the security interest in that collateral. Tenn. Code Ann. § 47-9-31[5](a)(1).

*GFB I*, 630 B.R. at 87-88.

FF&CB overlooks this central principle by arguing that GFB lost its perfection in Sales's inventory when Sales transferred GFB's collateral to Leasing, which was not a seller of trailers. FF&CB points to Tennessee Code Annotated section 47-9-311(d), which provides:

> INAPPLICABILITY TO CERTAIN INVENTORY. During any period in which collateral subject to a statute specified in subdivision (a)(2) is inventory held for sale or lease by a person or leased by that person as lessor and that person is in the business of selling goods of that kind, this section does not apply to a security interest in that collateral created by that person.

Subsection (d) is an exception to the rule in subsection (a)(2)(A) that perfection of a security interest in collateral that is subject to the state's certificate-of-title laws requires compliance with those laws (mandating perfection by notation on the collateral's certificate of title). This is because the UCC scheme provides that perfection of a security interest in inventory is accomplished solely by filing a UCC-1 financing statement. *See* Tenn. Code Ann. § 47-9-312(a); Tenn. Code Ann. § 47-9-311 cmt. 4 ("Compliance with [the] certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory to which this subsection applies.").

FF&CB, however, argues that section 47-9-311(d) applies to strip GFB of its security interest in the Subject Trailers because *Leasing* did not hold them for sale. Such an argument jumps over and wholly misapplies the foundational protections of secured parties under Article 9 when collateral is disposed of by a debtor and no exception applies to allow the disposition to be free of the security interest created by the debtor.

The following hypothetical, which removes the relatedness of the transferor and transferee present here, is instructive. Assume that an inventory seller of trailers (Transferor) transfers trailer inventory to a trucking company (Transferee) that holds and uses the trailers as equipment for its transportation business. The trailers, however, were subject to the inventory lien given by Transferor to Bank A, properly perfected by the filing of a UCC-1 financing

statement.  Next, assume that the facts show that the transfer of Bank A's collateral to Transferee was not in the ordinary course of business for whatever reason (say, for example, because the owner of Transferee threatened the owner of Transferor and no consideration was exchanged (except that Transferor's owner escaped without bodily injury)).  In such a circumstance, Transferee would take the collateral subject to the security interest of Bank A.  This is so because section 47-9-315(a)(1) says it is so.  If Transferee obtained funds from Bank Z by offering the transferred trailers as collateral and if Bank Z noted its lien on the certificates of title for the transferred trailers, those trailers nonetheless would remain subject to Bank A's perfected inventory lien.  That is, the transfer (not in the ordinary course) of the trailers to Transferee that is not in the business of selling trailers would not strip Bank A of its perfected inventory lien. This is so even though Bank Z is perfected by notation of its lien on the certificates of title. Bank Z has a properly perfected security interest in the trailers, but it is subject to the earlier perfected security interest of Bank A.[8]

FF&CB's argument applied to our hypothetical facts would mean that an inventory lien would not survive the transfer even if the sale was not to a buyer in the ordinary course.  The argument misunderstands the law and seems to conflate the two distinct questions of how to perfect inventory that is subject to the state's certificate-of-title law and what happens when property is transferred in contravention of the rights of secured parties under the UCC.

Under the facts here, only two exceptions could exist to change the general rule that a perfected security interest continues in collateral that is transferred:  (1) sale of inventory to a

---

[8] Doubtlessly, if Transferee had purchased the trailers in the ordinary course of business, then Transferee would have taken the trailers free of Bank A's lien as provided in section 47-2-403(2) and 47-9-315(a) – but under the principles of Article 9 and not because Transferee is not in the business of selling trailers.  In such a case, then Bank Z's security interest perfected by notation on the certificates of title would be first, and Bank A would have no interest in the transferred trailers; instead, Bank A's only security interest would be in identifiable proceeds of the collateral, as provided in section 47-9-315(a)(2).

buyer in the ordinary course of business under section 47-2-403(2), as expressly referenced in

section 47-9-315(a), and (2) the secured party's authorization of the disposition free of the

security interest under section 47-9-315(a)(1).

GFB argues that the first exception does not apply because the transfers of the Subject

Trailers by Sales to Leasing were not to a buyer in the ordinary course of business under section

47-2-403(2).  Section 47-2-403(3) defines "entrusting" as an exception to the general rule found

in section 47-2-403(1) that a transfer of goods subject to an Article 9 lien transfers to the

transferee only the rights of the transferor in the goods.  Under section 47-2-403(2), when a

secured party entrusts its collateral consisting of goods to a merchant who deals in goods of that

kind, the merchant has the power to transfer all the rights of the entruster to a buyer in the

ordinary course of business.  Similarly, section 47-9-320 provides that "a buyer in the ordinary

course . . . takes free of a security interest created by the buyer's seller, even if the security

interest is perfected and the buyer knows of its existence."

Importantly, "buyer in the ordinary course of business" is defined by the UCC:

> "Buyer in the ordinary course of business" means a person that buys goods in good
> faith, without knowledge that the sale violates the rights of another person in the
> goods, and in the ordinary course from a person . . . in the business of selling goods
> of that kind. A person buys goods in the ordinary course if the sale to the person
> comports with the usual or customary practices in the kind of business in which the
> seller is engaged or with the seller's own usual or customary practices. . . .

Tenn. Code Ann. § 47-1-201(9).  GFB relies solely on the element that requires a buyer in the

ordinary course to buy "without knowledge that the sale violates the rights of another person in

the goods." *Id.*

Operation of these statutes is illustrated by numerous cases over the past sixty years.  For

example, in *Taylor Motor Rental, Inc. v. Associates Discount Corporation*, 173 A.2d 688 (Pa.

Super. Ct. 1961), the plaintiff, a purchaser of a car from a car dealer, sued the dealer's lender that

held a security interest in all of the dealer's inventory. The owner of the car dealer was also an

officer and stockholder of the plaintiff-purchaser, and the owner also kept the dealership's books

and records and signed the dealership's checks, generally conducting the affairs of the

dealership. *Id.* at 689-90.  The car at issue was kept in a building that was shared by the

dealership and the plaintiff-purchaser.  *Id.*  The court affirmed the trial court's holding:

> It is clear that plaintiff was not a buyer in the ordinary course of business as
> defined by the Commercial Code.  Both the relationship of plaintiff and [the
> dealership], with their interlocking officers, shareholders and employees and the
> fact that both plaintiff corporation and [the dealership] were managed by [the same
> person] negates this.

*Id.* at 690.

In 1983, the bankruptcy court for the Western District of Texas held that a transfer of

inventory from one corporation to a  related corporation was not a sale in the ordinary course of

business. *First State Bank of Corpus Christi v. Del Tex Corp.* (*In re Del Tex Corp.*), 32 B.R. 403

(Bankr. W.D. Tex. 1983).  The secured lender had loaned funds to South Texas, an affiliated

entity[9] of Del Tex, the debtor in the bankruptcy case, and the secured lender claimed that it was a

secured creditor of Del Tex. *Id.* at 404.  The parent company caused transfers of inventory from

South Texas to Del Tex. *Id.*  Stating the issue as "whether the Bank's security interest over South

Texas' inventory survived the purported sale to Del Tex and is enforceable against Del Tex," *id.*

at 405, the court rejected Del Tex's argument that the security agreement authorized South Texas

to sell the bank's collateral. *Id.* at 406.  The court applied the UCC provision that is now section

9-315(a) to determine that the court was required to enforce the security agreement between the

bank and South Texas, "particularly the usage and meaning of the term 'inventory', which the

Court finds to be the chief operative term in the grant of authority" to sell the bank's collateral.

---

[9] South Texas and Del Tex were owned by the same parent company. *Id.* at 404.

*Id.* The court reviewed the facts to find that the transfers from South Texas to Del Tex were not sales in the ordinary course of South Texas' business, primarily because the parent company had failed to maintain the separateness of the two companies so that "the nature of the management . . . reached the point that they cannot be considered to be dealing at arms length with each other." *Id.* at 407. The court concluded that "the transfers . . . cannot be treated as sales in the ordinary course of business, but merely a shifting of assets between non-distinct entities." *Id.* The result was that the bank was a secured creditor of Del Tex to the extent of the value of the bank's collateral that was held by Del Tex after the transfer from South Texas. *Id.* at 408.

Two years later, the Supreme Court of Nevada held that a mobile home that a secured lender's debtor had sold to an individual was transferred subject to the lender's security interest in inventory. *Homes Sav. Ass'n v. Gen. Elec. Credit Corp.*, 708 P.2d 280 (Nev. 1985). The mobile home dealer gave an inventory lien to GECC, which properly perfected its lien. *Id*. at 282. When the dealer sold a mobile home to a consumer, the dealer would execute an installment sales contract and a security agreement with the consumer and assign its rights to Home Savings Association ("HAS"), which would pay the dealer the purchase price less the consumer's down payment. *Id.* HSA then obtained the title to the mobile home with its lien noted. *Id.* One of the mobile homes at issue in the litigation had been sold to a customer, but the customer had never made a down payment. *Id.* at 286. The evidence showed that the "deal fell through" and the customer did not take possession of the mobile home. *Id.* At the time that GECC repossessed the mobile home, it was on a residential site, not on the dealer's sales lot. *Id.* The court held that there had been no buyer and, thus, no buyer in the ordinary course. *Id.* Notably, the court so held even though the mobile home was no longer being possessed and offered for sale by the dealer. *Id.*

In a situation very similar to the facts here, in 1993, the bankruptcy court for the Southern District of Ohio held for the floor-plan financier over the holder of a purchase money security interest in a tractor that had been purchased by the debtors and repossessed by the floor-plan lender. *Bank One, Portsmouth, N.A. v. Dettwiller* (*In re Dettwiller*), 156 B.R. 540 (Bankr. S.D. Ohio 1993). The individual chapter 11 debtors and their son owned a tractor dealership that sold Kubota tractors, with Kubota retaining a properly perfected security interest in all equipment and inventory of the dealership. *Id.* at 541-42. The tractor at issue was purchased from the dealership by one of the debtors who "intended to lease the tractor to area farmers and had discussed this course of action with Kubota's representative." *Id.* at 542. He paid a portion of the purchase price from his own funds and financed the rest of the purchase from the plaintiff, Bank One, which perfected its security interest. *Id.* "The tractor remained on the premises of the [d]ealership. The [d]ealership did not inform Kubota of the sale." *Id.* The court held that the sale was not in the ordinary course of business because the debtor "did not act in good faith [and] that he knew that a sale without remitting the proceeds to Kubota violated the [security] [a]greement." *Id.* at 543.

The *Dettwiller* court acknowledged that "several courts have held that principals purchasing goods from corporations they control are not buyers in the ordinary course of business." *Id.* at 544 (citing *In re Palmer*, 103 B.R. 348 (Bankr. M.D. Ga. 1989); *Transam. Comm. Fin. Corp. v. Union Bank & Tr. Co.*, 584 So. 2d 1299 (Ala. 1991); *Merchants & Planters Bank & Tr. Co. of Arkadelphia v. Phoenix Hous. Sys., Inc.* 729 S.W.2d 433 (Ark. Ct. App. 1987); *In re Del Tex Corp.*, 32 B.R. at 407). As FF&CB does here, the competing creditor in *Dettwiller* argued that Kubota authorized the sale of the tractor, treating the argument as a separate ground for stripping Kubota of its inventory lien. *Id.* at 544-45. The court rejected the

argument by reference to Kubota's and the dealership's security agreement, which prohibited

disposition of Kubota's collateral except in the ordinary course of business. *Id.* at 545.

Finally, the *Dettwiller* court found that Kubota should win on policy grounds.

> In this contest between Kubota and plaintiff, it is appropriate that plaintiff should bear the loss. . . .  The policy of the buyer in the ordinary course exception to the primacy of the inventory lender's lien is rooted in commercial expediency. Requiring good faith retail purchasers in the ordinary course to search for encumbrances on purchased items is impractical and cumbersome. . . .  The buyer in the ordinary course of business doctrine "encourage[s] the marketability of goods and support[s] the reliance interest of buyers in the ordinary course who assume that they have clear title to the goods they purchase."

> Those principles ought not to avail this plaintiff, a lender to an insider buyer which seeks to prime the lien of Kubota, a prior and properly perfected inventory lender.  Kubota did all it could have been expected to do to protect its security interest.  It properly and timely filed a UCC-1 financing statement and continuation of same. . . .  Moreover, Kubota[] . . . states that it did not learn of the sale of the tractor until after debtors had filed their bankruptcy petition.  This lack of notice is consistent with the debtors' failure to remove the tractor from the dealership premises after the purchase,[10] thereby concealing from Kubota the fact that the tractor had been purchased.

*Id.* (citations omitted).

Also instructive is the more recent case of *Automotive Finance Corporation v. DZ

Motors, LLC*, 104 UCC Rep. Serv. 2d 740, No. 16-7955, 2021 WL 1380605 (D.N.J. Apr. 9,

2021).  There, the floor-plan lender sued a credit union that had financed a sham sale to the then-

wife of the car dealership's owner. *Id.* at *5.  The court parsed through the evidence concerning

whether the sale of a Bentley to the dealer's owner was legitimate and determined that if the

owner of the dealership or his wife had been buyers in the ordinary course, either could have

taken the car free of the inventory lienholder's UCC lien. *Id.* at *12.  Likewise, a lender that

---

[10] Although GFB has not raised the point and it is not material to the Court's analysis, the record establishes that Sales and Leasing shared one address, which presumably means that the Subject Trailers remained on the Sales property mixed with other trailers held for sale or leasing by Sales and for leasing by Leasing.

financed such a purchase would be able to defeat the inventory lien. *Id.*  Nonetheless, the court held the following:[11]

> On this record, there can be no serious contention that the Zholobovs were in any sense buyers in the ordinary course. *Accord with Martin Marietta Corp. v. N.J. Nat'l Bank*, 612 F.2d 745, 751 (3d Cir. 1979) ("[I]f the sale was a sham to avoid the seller's obligation to his creditor, then it probably would not satisfy . . . the buyer in the ordinary course requirement"); *Taylor Motor Rental*, 173 A.2d at 690 (rejecting an assertion that plaintiff was a buyer in the ordinary course where the operator of the dealership acted for both the dealership and the purported buyer "in applying for the certificate of title in the name of the plaintiff. The purported sale by seller to the plaintiff [buyer] was merely a paper transaction for the benefit of [seller], who now has possession of the automobile for which defendant has never been paid.").

*Id.*

In response to GFB's argument that Leasing was not a buyer in the ordinary course of business, FF&CB relies on section 47-9-320[12] to assert that Kris Fellhoelter's knowledge of GFB's security interest does not prevent Leasing from taking the Subject Trailers free of that interest. [Doc. 25 at 7.]  Once again, FF&CB conflates two provisions of the UCC.  Certainly, knowledge of a perfected security interest does not prevent a buyer from being a buyer in the ordinary course of business, but a buyer may not be a buyer in the ordinary course of business unless the buyer is "without knowledge that the sale violates the rights of another person in the goods." Tenn. Code Ann. § 47-1-201(9).

Thus, the foundational question here is whether GFB has presented undisputed facts to establish that Leasing was not a buyer in the ordinary course of business in light of the statutory definition and the provisions of the Security Agreement and Revolving Loan Agreement between

---

[11] Though this Court acknowledges that much of the *DZ Motors* opinion concerns whether the vehicle remained for sale by the dealership after the purported sale, that analysis does not support FF&CB's argument here that GFB lost its perfected inventory lien because Leasing was not in the business of selling trailers. It matters not that Leasing was not in the business of selling trailers because under section 47-9-315(a), GFB's inventory lien continued in the Subject Trailers unless they were sold to Leasing *as a buyer in the ordinary course of business*.

[12] Section 47-9-320(a) provides, in material part, that a "buyer in the ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."

Sales and GFB.  FF&CB asserts that "there is a dispute as to what GFB's rights were under the [S]ecurity [A]greement and whether there was a violation of a term in the [S]ecurity [A]greement." [Doc. 25 at 8.]  To the contrary, the Court finds that the undisputed facts – namely, the Security Agreement and Revolving Loan Agreement – are unambiguous concerning GFB's rights and Sales's obligations and establish that Leasing was not a buyer of the Subject Trailers in the ordinary course of business.

The Revolving Loan Agreement and Security Agreement between GFB and Sales were signed by Kris Fellhoelter, who was the general manager of both Sales and Leasing.  Kris Fellhoelter also signed at least one of the invoices on behalf of Sales purporting to sell the Subject Trailers to Leasing as well as the Commercial Promissory Notes on behalf of Leasing to pledge a security interest to FF&CB in the Subject Trailers. [Doc. 26-1 at 4-6, 17-19, 22-23, 34-37.]  The Revolving Loan Agreement and Security Agreement contain numerous provisions to protect GFB's lien in Sales's inventory.  GFB even procured the signatures of Kris Fellhoelter, individually and as President of Leasing (along with other officers of Sales and Leasing), to acknowledge his awareness of the terms of the Revolving Loan Agreement and Security Agreement.  The Security Agreement requires the express written consent of GFB for Sales to dispose of any of GFB's collateral other than by a sale of inventory in the ordinary course of business.  The Security Agreement also contains a provision against any waiver of GFB's rights by any failure of GFB to exercise or delay in exercising any right.  Presumably because of the relationship between Sales and Leasing and their owners, the Revolving Loan Agreement (which was incorporated into the Security Agreement) defined "Ordinary Course of Business" and expressly authorized an "occasional sale" of inventory to another dealer, but only if the other dealer "is not a Related Person" [Doc. 19-2 at 23], which is also defined to clearly include Leasing and Kris Fellhoelter. [*See* Doc. 19-2 at 24.]

Consequently, the record indisputably establishes that Kris Fellhoelter and Leasing were *not* "without knowledge that the sale violate[d] the rights of another person in the goods," Tenn. Code Ann. § 47-1-201(9), because GFB did not actively release its inventory lien on the Subject Trailers. Thus, Leasing was not a buyer of the Subject Trailers in the ordinary course of business.

FF&CB parses words when disputing that GFB did not authorize the sale of the Subject Trailers to Leasing. FF&CB asserts that the Subject Trailers were purchased by Sales with funds from First Peoples Bank and that GFB treated such inventory collateral differently. The argument is that GFB impliedly authorized the transfer of the Subject Trailers to Leasing by some pattern and practice between GFB and Sales.

First, the Revolving Loan Agreement and Security Agreement prohibit implied waiver or modification by GFB, and as explained by this Court in the Memorandum and Order on Motion for Discovery Under Rule 7056 [Doc. 51], which is incorporated herein by reference, the express terms of the agreements control under Tennessee law. Further, absent knowledge and reliance by FF&CB, it cannot be the beneficiary of any such implied waiver or modification.

As this Court previously explained, FF&CB was not without the ability to protect itself. The Article 9 scheme apportions the risk to the party best able to prevent the harm.

> The continued perfection on disposition of collateral means that 'any person seeking to determine whether a debtor owns collateral free of security interests must inquire as to the debtor's source of title and, if circumstances seem to require it, search in the name of the former owner.' [Tenn. Code Ann. § 47-9-507 cmt. 3.] Here, the result is that any creditor of Leasing (or any other transferee) that wanted to ensure a first-priority lien on the trailers offered by Leasing as collateral could have inquired about Leasing's source of title.

*GFB I*, 630 B.R. at 88. The Ohio Court of Appeals in *RFC Capital Corporation v. Earthlink, Inc.*, 55 UCC Rep. Serv. 2d 617, 2004 WL 2980402, at *14 (Ohio Ct. App. Dec. 23, 2004), explained the steps available to a purchaser (or, as in this case, to the lender of a purchaser):

By giving the secured party the power to authorize the release of the security interest, the UCC places the secured party in a superior position over a third party purchaser. Thus, the onus is on the third party purchaser to determine if a security interest exists and ensure that the secured party fully authorizes the release of that security interest. If the third party purchaser does not conduct a search of UCC filings or does not obtain a release, it must bear the risk and/or burden of buying potentially encumbered collateral.

This burden, however, is relatively light. When purchasing goods that are subject to a security interest, the buyer must simply communicate with the secured party disclosed in the UCC filing to determine what conditions, if any, the secured party has placed upon its consent to a release. *See Wabasso State Bank v. Caldwell Packing Co.*, 251 N.W.2d 321, 324 (Minn. 1976) ("[A] simple phone call would have determined whether the bank had authorized [the] sale"). If a secured party discloses that it will only consent if the seller satisfies a condition (whether it be a condition precedent or subsequent to the release), the buyer can then investigate the likelihood of the condition occurring, value the collateral in the context of the potentially ongoing security interest and generally assess the risk of going forward with the transaction. If the buyer determines that the risk presented by the conditional consent is too high, it can decide not to consummate the deal. While the condition may only be in the seller's power to satisfy, the decision to purchase the collateral is totally within the buyer's power.

Given the open and notorious relationship between Sales and Leasing, including their shared location of operations and common owners, FF&CB could and should have inquired about the source of the Subject Trailers.  Indeed, the very invoices from Sales to Leasing were provided to FF&CB, which could have searched for any inventory liens and could have contacted GFB to learn whether the transfer for the Subject Trailers had been approved by GFB or was a sale in the ordinary course under section 47-2-403(2).

Although sometimes the UCC must be applied in a way that seems inequitable, here, the Court has no difficulty applying the UCC to find that GFB's inventory lien remained perfected and attached to the Subject Trailers after Sales transferred them to Leasing, with "financing" provided by FF&CB.

## V.  CONCLUSION

Because GFB has established by undisputed material facts that the transfers of the

Subject Trailers from Sales to Leasing were not sales to Leasing as a buyer in the ordinary

course of business (because Leasing is charged with knowledge that the transfer was in violation

of GFB's inventory security interest), the Court finds that summary judgment in favor of GFB is

required under Tennessee law.

A Judgment consistent with this Memorandum will be entered.


FILED:  November 4, 2024

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE